UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

JORDAN MIRCH

        Debtor.

Case No. 08-64473
Chapter 7
Judge Phillip J. Shefferly

---

RDI OF MICHIGAN, LLC, a Michigan limited
liability company, and Universal Video, Inc., a
Michigan corporation,

        Plaintiffs,

v.

JORDAN MIRCH,

        Defendant.

Adversary Case No. 09-04060

---

## PLAINTIFFS' FIRST AMENDED COMPLAINT TO EXCEPT DEBTS FROM DISCHARGE PURSUANT TO BANKRUPTCY CODE SECTION 523 AND TO DENY DEBTOR DISCHARGE UNDER BANKRUPTCY CODE SECTION 727

Plaintiffs, RDI of Michigan, LLC and Universal Video, Inc., by and through their attorneys, state the following in support of their Complaint:

## PARTIES AND JURISDICTION

1.      Plaintiff, RDI of Michigan, LLC ("RDIM") is a Michigan limited liability company with offices in the City of Bloomfield Hills, County of Oakland, State of Michigan.

2.      Plaintiff, Universal Video, Inc. ("UVI") is a Michigan corporation with offices in the City of Southfield, County of Oakland, State of Michigan.

3.      Defendant, Jordan Mirch ("Debtor"), is an individual who filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code on October 7, 2008.

1

4. On March 27, 2009, this Court converted Debtor's case to a case under Chapter 7. On January 9, 2009, RDIM filed a complaint to determine dischargeability of Debtor under 11 USC 11 USC §§ 523(a)(4) and (a)(6).

6. On November 30, 2009, a Report of Parties' Rule 26(f) Conference was filed granting RDIM the right to file an amended pleading until January 8, 2010.

7. This is an adversary proceeding brought pursuant to Rules 4007 and 7001(6) of the Federal Bankruptcy Rules, and relates to the Chapter 7 proceedings currently pending in the United States Bankruptcy Court Eastern District of Michigan: In re Jordan Mirch, Case No. 08-64473-pjs.

8. This Court has jurisdiction over this matter pursuant to 28 USC Sections 157 and 1334, and Bankruptcy Code Section 523 (11 USC § 523). This is a core proceeding under 28 USC § 157(b).

## GENERAL ALLEGATIONS

9. At all relevant times herein, RDIM was the exclusive licensee in Michigan of certain copyrights (the "Copyrights") and trademarks (the "Trademarks") (collectively, "RDIM's Copyrights") for Riviera Distributors, Inc., an Illinois corporation ("Riviera") in connection with certain video poker games, commonly known as the Michigan Superstar video poker games (the "Video Poker Games").

10. The computer software programs incorporated into the Video Poker Games were registered by Rivera with the U.S. Copyright Office as Copyright Registration Nos. TX-6-062-022 and TX-6-062-023 and PA 1-340-639. These games are typically played by consumers in restaurants, private clubs and bars.

11. Pursuant to its exclusive license agreement with Riviera, RDIM had the right to

2

sue for infringement of the Copyrights as well as to sue for any other claims, which arise out of the infringing activities.

12. Debtor individually and through his solely owned corporation, Michigan Coin-Op Vending, Inc. ("MCO"), were engaged in the business of distributing coin operated amusement games and devices to various locations in Michigan.

13. The locations in which Debtor and MCO (collectively referred to hereinafter as, "Mirch") placed coin-operated amusement devices, included without limitations, various restaurants, bars, fraternal organization halls and related entities in the Michigan area (collectively the "Route Locations").

14. RDIM investigated the business and activities of Mirch, and it concluded that Mirch placed video poker games that infringed (the "Infringing Video Poker Games") at his Route Locations and were in many instances simply illegal knock-offs of the Video Poker Games distributed by RDIM.

15. In March 2007, RDIM discovered that Mirch had more than 120 Route Locations in Michigan using Infringing Video Poker Games.

16. RDIM notified Mirch that its activity violated Riviera's Copyrights to the Video Poker Games, and that such conduct constituted an unlawful infringement activity.

17. Mirch, nevertheless, refused to stop his infringement activity until the parties reached a conditional settlement in April 2007 wherein Mirch, in part, admitted and represented that he operated 127 Infringing Video Poker Games (the "Conditional Settlement Agreement").

18. As part of the Conditional Settlement Agreement, Mirch entered into a License and Lease Agreement with RDIM on April 9, 2007. As part of the this agreement, Mirch agreed to replace all of its Infringing Video Poker Games totaling 127 games with RDIM's authorized

3

Video Poker Games.

19.    The License and Lease Agreement, Section 3, provided that Mirch would turnover to RDIM the 127 Infringing Video Poker Games, and RDIM would lease to Mirch 127 authorized Video Poker Games.

20.    The License and Lease Agreement, Section 25, provided that as consideration for the execution and full performance under this agreement, RDIM would conditionally release all claims against Mirch for copyright infringement based upon the Mirch's representation under Section 3.1 that he only operated 127 Infringing Video Poker Games.

21.    The License and Lease Agreement, Section 3.2, also provided that Mirch was to return to RDIM the 127 Infringing Video Poker Games.

22.    The Debtor personally guaranteed under Section 25 full performance under the License and Lease Agreement, including without limitations, all damages and all other sums, fees and charges of every description payable by MCO, including the prompt performance of all obligations, covenants, and conditions to be observed and performed by MCO.

23.    On November 14, 2007, Mirch notified RDIM that he would not return the 127 Infringing Video Poker Boards nor would it comply with the other terms and conditions under the License and Lease Agreement.

24.    On January 11, 2008, RDIM brought a state law action in Oakland County Circuit Court (the "State Court litigation"), which was assigned to the Hon. D. Langford Morris under Case No. 08-088525-CK, seeking damages and injunctive relief for Mirch's breach of the Conditional Settlement Agreement and the License and Lease Agreement.

25.    At the preliminary injunction hearing in the State Court Litigation on January 23, 2008, Mirch turned over to the court 127 Video Poker Games that RDIM had licensed to Mirch,

4

but within days thereafter, RDIM was informed by two of Mirch's former employees, Daniel Domek and Kevin Carson, under notarized affidavits that Mirch ordered them to make knock-off computer chips logic on an Eprom chip burner to produce Infringing Video Poker Games to replace the 127 Video Poker Games turned over to the court.

26. Based upon the information from Mirch's former employees, RDIM commenced a copyright infringement action against Mirch in federal court on March 19, 2008 (the "Federal Court litigation"), which was assigned to the Hon. Lawrence Zatkoff under Case No. 08-11177.

27. As events unfolded in 2008, RDIM discovered that the Debtor had grossly underrepresented the number of Infringing Video Poker Games used in his Route Locations for the period March 2007 through 2008. Specifically, at Mirch's initial 341 examination on August 25, 2008 in the MCO's Chapter 11 bankruptcy case, which was assigned to the Hon. Phillip J. Shefferly in Case No. 05-57619 (the "MCO's Bankruptcy Litigation"), Mirch testified that MCO's schedules were correct (341 Hearing, 8/25/08, Tr., p. 10, lines 15-25), even though the schedules failed to reference MCO's possession and use of Infringing Video Poker Games. See also Tr., p. 11 (Mirch testified under oath that the inventory provided to the U.S. Trustee Berg was correct). At the 341 hearing, Mirch had both bankruptcy and criminal counsel present. Mirch's criminal attorney had Mirch assert his 5th Amendment Rights.

28. On September 16, 2008, Judge Langford Morris entered a default judgment against the Debtor in the amount of $2,002,294.16 [based, in part, upon the liquidated damage for the misrepresenting the Debtor's use of Infringing Video Poker Games provided in Section 25 of the License and Settlement Agreement] for failing to attend a pretrial conference as ordered under the court's order dated August 27, 2008. Prior to this time, the Debtor was also sanctioned in Judge Langford Morris' Opinion of June 5, 2008 for failure to attend a hearing on

5

the Debtor's own motion for summary judgment, which was denied for lack of merit. The Debtor also failed to appear at another court-ordered event in September 2008 and a warrant for Debtor's arrest was issued by Judge Langford Morris.

29.     The Debtor's manipulation of the State Court Litigation through numerous frivolous actions was done to injure RDIM through the Debtor's continued use of Infringing Video Poker Machines, even though RDIM had given the Debtor unambiguous notification about his continuing commission of copyright infringement.

30.     The Debtor's continued use of the Infringing Video Poker Games also violates Judge Zatkoff's TRO (Dkt. 4), Preliminary Injunction (Dkt. 53) and Permanent Injunction (Dkt. 64) in the Federal Court Litigation. In entering the preliminary injunction, Judge Zatkoff stated that the Debtor had engaged in copyright infringement "both before and after the TRO was issued ... (showing) ... contempt for Plaintiff's intellectual property and the judicial process." (Dkt. 53, p. 8.)

31.     In fact, on July 9, 2008, RDIM filed a reply to its motion for preliminary injunction (Dkt. 4) setting forth the Debtor's contempt for Judge Zatkoff's TRO (Dkt. 4) in his continued use of Infringing Video Poker Games.

32.     On September 9, 2008, the United States Trustee ("UST") filed a motion in the MCO Bankruptcy Litigation to dismiss or convert the case to a Chapter 7 (MCO Bankruptcy Dkt. 57) based in part upon Mirch's unwillingness to testify fully about: (I) the assets of MCO, including the Debtor's use of the Infringing Video Poker Games; (ii) the proceeds earned from the use of the Infringing Video Poker Games; and (ii) the lack of information available to creditors with respect to MCO's financial condition.

33.     On October 2, 2008, a Notice to Appear was entered in the Federal Court Litigation ordering the Debtor to appear before Judge Zatkoff (Dkt. 49) on October 14, 2008.

6

34. Immediately before the hearing on October 14, 2008, the Debtor filed notice in the Federal Court Litigation that he had filed a Voluntary Petition under Chapter 11 (Case No. 08-64473) (Dkt. 50).

35. In response to the UST's motion in the MCO Bankruptcy Litigation to dismiss or convert case to a Chapter 7 (MCO Bankruptcy Dkt. 57), Judge Shefferly entered an order on November 6, 2008 (MCO Bankruptcy Dkt. 93) dismissing the Debtor as debtor-in-possession and appointed Samuel Sweet as trustee ("Trustee Sweet").

36. The Debtor continued to act as a trusted employee for Trustee Sweet during the administration of the MCO bankruptcy estate.

37. At no time prior to March 16, 2009, when the bankruptcy court decreed that Trustee Sweet was discharged as trustee of the estate and the Chapter 11 case is closed, did Trustee Sweet terminate the Debtor as a trusted employee for the MCO estate.

38. On January 12, 2009, Trustee Sweet entered into a Resolution of Claims and Asset and Purchase Agreement with RDIM and UVI (the "Resolution and Sale Agreement") Pursuant to this agreement, the Trustee sold MCO Route Locations, including without limitations, all Infringing Video Poker Games to UVI.

39. On January 12, 2009, Judge Shefferly entered a Turnover Order (MCO Bankruptcy Dkt. 140) permitting the Trustee Sweet to turnover all Video Poker Games to UVI.

40. On January 13, 2009, the Trustee met UVI's attorney, Robert C. Horvath, at MCO's warehouse at 1511 Jarvis, Ferndale (the "Jarvis Warehouse") to monitor the turnover of Infringing Video Poker Games to UVI.

41. By the end of the day on January 13, 2009, Trustee Sweet, Attorney Horvath and UVI discovered that Infringing Video Poker Games at the Jarvis Warehouse had been tampered

7

with as the devices all had missing circuit boards and/or logic chips in contravention of Judge Zatkoff's TRO (Dkt. 4) and Preliminary Injunction (Dkt. 53).

42.     Trustee Sweet, RDIM and UVI later learned that the Debtor, while working as Trustee Sweet's trusted employee, converted the Route Locations into a sham entity, For Amusement Only, LLC ("FAO"), formed by Martin Lustig ("Lustig") for the Debtor within days after Trustee Sweet was appointed by Judge Shefferly. Lustig later assigned FAO to Gerard DeMichele ("DeMichele"), who shared offices at the Jarvis Warehouse with MCO during Trustee Sweet's administration of the MCO estate, and who was intimately familiar with Judge Zatkoff's TRO (Dkt. 4) and Preliminary Injunction (Dkt. 53) not to transfer, move, relocate, dispose of, dissipate, secret or hide the Infringing Video Poker Games.

43.     Of the 236 Infringing Video Poker Games reported by the Debtor on MCO's Amended Schedule B (MCO Bankruptcy Dkt. 50), less the 72 Infringing Video Poker Machines seized by the U.S. Marshal pursuant to Judge Zatkoff's Seizure Order (Dkt. 4), UVI recovered 48 tampered, Infringing Video Poker Games at the Jarvis Warehouse and 5 in MCO's Route Locations. The balance of the Infringing Video Poker Games, or 111 games, were transferred, moved, relocated, disposed of, dissipated, secreted or hidden in cooperation with the Debtor and other MCO's employees (including without limitations, Christopher Chad Heron ("Heron"), DeMichele and/or Lustig.

44.     DeMichele admitted to RDIM's attorneys, Robert C. Horvath and Stephen Wasinger, before the expedited hearing before Judge Shefferly on January 16, 2009 (MCO Bankruptcy Dkt. 151) that Trustee Sweet advised him, (I) to start up a separate company to operate a video poker route with non-infringing video poker games; (ii) that he could employ the

8

Debtor because he had been fired by the Trustee Sweet in November 2008; and (iii) since the Debtor's firing, the Debtor has been working solely for FAO.

45.     DeMichele also admitted after the hearing on January 16, 2009 to Robert C. Horvath, Tracy Ann Wolf and UVI, through Norman Barman, that: (I) the Debtor replaced and secreted the Infringing Video Games owned by the MCO estate that were to be sold to UVI under the Resolution and Sale Agreement with video poker games assembled by Lustig; (ii) he was being used as a pawn by Mirch and Lustig; (iii) he could not sell FAO to UVI because Lustig had him sign some agreement that prevented him from selling FAO unless Lustig agreed with the sale and the buyer; (iv) he had no money invested in FAO, had no money himself, didn't care about the company and just wanted to get out of this mess; and (v) that Lustig had called him at 7:00AM earlier in the day stating, "What's our boy up to now".

46.     DeMichele's attorney, Frank Palazzolo, stated in a state court filing on April 3, 2009 in a case presently pending before Judge Richard Caretti, Macomb County Circuit Court Judge, Case No. 2009-0433-CZ, that,

> "While MCO was proceeding under bankruptcy protection, Gerard DeMichele also saw a business opportunity. There was now a void in the industry because of MCO having all of its assets sold off. Most of the locations that MCO had previously placed its equipment at were not under any written contract which contract could be argued was sold to UVI per Judge Shefferly's Order. Because of the intellectual knowledge of Jordan Mirch, DeMichele decided also to go into the video poker device route business but elected to purchase and install completely different video poker devices than originally designed by Merit Industries which were not subject to the Merit copyrights that were now owned by RDI (of Illinois) and licensed to RDIM exclusively in Michigan. With the assistance of Mace Financial and its principal Martin Lustig, For Amusement Only LLC (FAO) was born. On November 8, 2008 Martin Lustig filed Articles of Organization for For Amusement Only LLC. On November 12, 2008 DeMichele accepted an Assignment of Interest in the Articles of Organization. He immediately filed for a Federal Identification Number and entered into an Operating Agreement as the Sole Member. DeMichele continues to own FAO since that date...."

9

47.     DeMichele's statement above through his attorney preface the reasons why FAO and Mace Financial, LLC ("Mace") were formed.  Specifically, so that the Debtor, DeMichele and Lustig could defraud the MCO bankruptcy estate and convert assets sold to UVI under the Resolution and Sale Agreement. Their fraudulent conduct also violated Judge Zatkoff's TRO (Dkt. 4) and Preliminary Injunction (Dkt. 53) by moving, transferring, and secreting and hiding the Infringing Video Poker Games and replacing them with video poker games assembled by Lustig.

48.     Trustee Sweet denies that he fired the Debtor while he administered the MCO estate.

49.     On October 29, 2008, the Debtor testified before Judge Shefferly in opposition to the UST's Motion in the MCO Bankruptcy Litigation to dismiss or convert case to a Chapter 7 that Judge Zatkoff's TRO (Dkt. 4) did not prevent him from using the Infringing Video Poker Games, which was false.

50.     The Debtor's testimony above is contrary to Judge Zatkoff's TRO (Dkt. 4) and/or any other ruling made in the Federal Court Litigation.

51.     The Debtor and DeMichele operated FAO out of the Jarvis Warehouse replacing Infringing Video Poker Machines with video poker games made by Lustig  without Trustee Sweet's knowledge or consent.  In fact, on January 13, 2009, UVI's attorney, Robert C. Horvath, met with Trustee Sweet at the Jarvis Warehouse to facilitate Judge Shefferly's Order of Turnover (MCO Bankruptcy Dkt. 140) when they learned for the first time that some of MCO's Infringing Video Poker Games at one of MCO's Route Locations called the Grafton Inn, had been moved and replaced with another video poker game purportedly owed by DeMichele through FAO that was assembled by Lustig.  Attorney Horvath spoke with the owner of the Grafton Inn, John A. Imo, while still standing next to Trustee Sweet in the conference room at the Jarvis Warehouse.

10

Mr. Imo told Attorney Horvath that the MCO's video poker games were removed approximately two (2) months earlier when he entered into a contract with FAO, which listed 1-888-843-3690 at its office number. Using his cell phone, Horvath called FAO at 1-888-843-3690 in an attempt to verify Mr. Imo's statements. Susan (last name unknown) answered the phone for FAO and when asked if the video poker games at the Grafton Inn were owned by FAO, she said "Yes". Horvath then asked Susan where FAO's offices were located, Susan said at "1511 Jarvis, Ferndale, MI". Horvath said, "that's not possible; I'm standing here at a conference room at 1511 Jarvis with MCO's Trustee, Sam Sweet, and you are not at this office". She said, "No, I am here". Mr. Horvath and the Trustee walked out of the conference room into the hallway to look for Susan. Two Ferndale uniform police officers were standing in the reception area next to 3-4 cubicles. While still talking to Susan on the cell phone, Trustee Sweet and Horvath peaked around the first cubicle and a woman turned around and said, "Hello, I'm Susan".

52.     The Debtor, aided and abetted by DeMichele and Lustig, violated his fiduciary and statutory duties and engaged in conduct which diverted revenues and assets of MCO, including without limitations, video poker equipment and oral and written contracts with Route Locations and income, that were sold to UVI under the Resolution and Sale Agreement (the "UVI Assets") for his own benefit and the benefit of his co-conspirators.

53.     The conduct of Mirch, DeMichele, Lustig and FAO thus violated 18 U.S.C. §§ 152, 152 and 154, which impose criminal liability on Mirch and those who acted with him from profiting, directly or indirectly, from their egregious, illegal and criminal conduct.

54.     On January 23, 2009, Judge Shefferly entered an Order (MCO Bankruptcy Dkt. 160.) granting Trustee Sweet's motion to dismiss the MCO case stating "...this Court shall retain jurisdiction to allow the Trustee to effectuate the sale...."

11

55.     On August 24, 2009, Judge Zatkoff entered an Opinion and Order (Dkt. 64) finding the Debtor's infringement conduct was willful, and awarded RDIM $150,000 in statutory damages under 17 U.S. C. 504(c)(2), plus attorneys' fees and costs.

56.     Upon information and belief, since the entry of Judge Zatkoff's Opinion and Order above referenced, the Debtor, DeMichele and Lustig have continued to use Infringing Video Poker Games and the UVI Assets.

57.     The Debtor, DeMichele, and Lustig converted and misappropriated property sold by the MCO bankruptcy estate to UVI (the "Fraudulent Scheme") for their sole and personal benefit knowing that they have no right, title, or interest in the UVI Assets.

58.     The Debtor, DeMichele and Lustig conspired to commence the Fraudulent Scheme to secrete and convert the UVI Assets. By way of example, DeMichele testified at his deposition on June 18, 2009 that the Debtor and/or MCO employees placed replacement, or FAO video poker machines at the MCO Route Locations. Specifically, DeMichele generally testified that,

        a.   Mirch helped DeMichele get all of MCO's Route Locations (Tr., p 121);
        b.   Mirch handles all customer relationships in FAO's Route Locations (Tr., p 136);
        c.   FAO uses the same employees as MCO and the MCO bankruptcy estate used (Tr., p 149);
        d.   DeMichele used MCO employees to organize and run FAO's Route Locations (Tr., p 149);
        e.   DeMichele didn't want MCO's assets, they were too old. DeMichele just wanted the employees and the Route Locations (Tr., p 154); and
        f.   DeMichele relied on the revenues earned by the Route Locations to justify buying equipment from Mace (Tr., p 157).

59.     FAO and Mace were created as a sham entity by the Debtor, DeMichele and Lustig as a vehicle to engage in and carry out the Fraudulent Scheme.

60.     Pursuant to the Fraudulent Scheme, the Debtor, DeMichele and Lustig created sham financial documents purporting to show that FAO purchased $600,000 worth the

12

amusement machines from Mace on or about December 31, 2008. However, Lustig initially asserted that part of the purported amusement machines sold by Mace to FAO was purchased from Wolverine America, Inc., but which Lustig now asserts was never acquired by Mace. The proffered "sale" between Mace and FAO on December 31, 2009 also lacks other indicators of legitimacy inasmuch neither Mace or FAO paid sale taxes totaling $30,000 to the State of Michigan. In addition, Lustig performed no credit reviews on FAO or DeMichele, did not require FAO or DeMichele to maintain property insurance on $600,000 worth of amusement machines (contrary to the nominal terms of the paperwork), and Mace and Lustig do not even know where the amusement machines were located. And the limited paperwork that does exist, quite bizarrely, refers to the State of Massachusetts for the law that is to govern the Promissory Note between Mace and FAO.

61.    Lustig's sale of amusement machines to FAO under the Purchase Order dated on December 31, 2008 also lacks other indicators of legitimacy inasmuch as Gary Sebenick, the post commander for the American Legion Post, Saginaw, Michigan (one of the Route Locations that UVI acquired from Trustee Sweet under the Resolution and Sale Agreement) testified at his deposition on June 12, 2009 that the Debtor replaced the Infringing Video Poker Games on their premises with FAO video poker machines in November 2008, more than a month before Mace's claim that it sold the amusement equipment to FAO. John Doyle, the building manager for the American Legion, also testified at his deposition on June 12, 2009 (in support of Gary Sebenick's testimony) that Huron, an employee for Trustee Sweet, placed FAO video poker machines at the American Legion prior to November 12, 2008, the date he left for his annual vacation, and that the date on the FAO location contract given to him by FAO had been falsified by the Debtor.

13

62.     Lustig and DeMichele acted as an agent and alter ego for the Debtor to assist him in evading his responsibilities and duties as a trusted employee for Trustee Sweet to convert the UVI Assets and to otherwise violate Judge Zatkoff's TRO (Dkt. 4), preliminary injunction (Dkt. 53) and permanent injunction (Dkt. 64) in the Federal Court Litigation (the "Federal Court Injunctions").

63.     DeMichele (and, FAO) and Lustig (and, Mace) knew that the Debtor, as well as the other employees for the MCO bankruptcy estate, including Huron, were acting in a fiduciary capacity as an agent for Trustee Sweet, but Mace/Lustig nevertheless delivered equipment to the Route Locations to replace, convert and/or secret the UVI Assets.

64.     Lustig's investment in Mace, FAO, and MCO's bankruptcy estate was in the form of equity, which may be inferred from what the parties do through their actions and from the economic reality under the circumstances, as opposed to debt, which said equity was sold by Trustee Sweet to UVI under the Resolution and Sale Agreement, as no parties filed an objection to the Sale Order prior to the cutoff date of January 22, 2009 set forth in the Bankruptcy Court's Turnover Order dated January 12, 2009 (MCO Bankruptcy Dkt. 140). Judge Shefferly entered an Order Granting Trustee's Motion for Sale and Other Relief on January 23, 2009 (MCO Bankruptcy Dkt. 159).

65.     RDIM and UVI would have never entered into the Resolution and Sale Agreement had it known about the Fraudulent Scheme.

66.     As a result of such willful, malicious, fraudulent and criminal conduct of the Debtor, the instant Chapter 7 as it relates to (I) default judgment entered in the State Court Litigation; and the (ii) damages set forth under the Opinion and Order (Dkt 64) entered in the Federal Court Litigation are exempt from discharge under the Bankruptcy Code.

## COUNT I
## EXCEPTION FROM DISCHARGE
## UNDER BANKRUPTCY CODE SECTION 523(a)(2)(A)

67. Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1 through 66 as if fully restated herein.

68. MCO obtained property and services from RDIM under the License and Lease Agreement through material misrepresentation made by the Debtor as to the number of Infringing Video Poker Games used in MCO's Route Locations.

69. In connection with the License and Lease Agreement, the Debtor promised, represented and warranted that he would personally guarantee RDIM for its property and services rendered on MCO's behalf.

70. Unbeknownst to RDIM, the Debtor never had any intention of personally compensating RDIM for the property and services rendered to MCO, but instead was entered into to disguise the true number of Infringing Video Poker Games used by the Debtor.

71. At the time that RDIM made advances of property and services under the License and Lease Agreement to MCO, and at all times thereafter, the Debtor knew his representations as to the number of Infringing Video Poker Games that he was using was false or made with gross recklessness as to its truth.

72. The Debtor knew and intended that his concealment and omission of material facts would deceive RDIM, which in fact occurred.

73. The Debtor justifiably relied on the false representation made by the Debtor in entering into the License and Lease Agreement.

74. RDIM also advanced ten (10) video circuit boards to the Debtor *after* the Debtor made the false statements in the License and Lease Agreement.

15

75.     The Debtor's conduct in misrepresenting the number of Infringing Video Poker Games used in its Route Locations amounted to actual fraud that prevented RDIM from receiving the benefit of its bargain under the License and Lease Agreement.

76.     The Debtor intentionally and maliciously made the aforementioned misrepresentations to RDIM and concealed and hid material facts from Plaintiffs in an effort to deceive and induce RDIM to rely to its detriment, which in fact occurred.

77.     RDIM reasonably relied upon the Debtor's promises and representations guaranteed by him under the License and Lease Agreement.

78.     RDIM's reliance was the proximate cause of losses set forth in the default Judgment entered against the Debtor in the State Court Litigation totaling $2,002,294.16.

79.     The $2,002,294.16 debt owed by the Debtor to RDIM, should be excepted from the Debtor's bankruptcy discharge under Bankruptcy Code Section 523(a)(2)(A) based upon the Debtor's fraudulent conduct through false pretenses, false representations and actual fraud, upon which RDIM reasonably relied, and RDIM should be awarded interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b).

WHEREFORE, Plaintiffs respectfully request this Court to:

A.     Except the debt totaling $2,002,294.16 owed to RDIM from the Debtor's bankruptcy discharge pursuant to Bankruptcy Code Section 523(a)(2)(A; and

B.     Award interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b).

## COUNT II
### EXCEPTION FROM DISCHARGE UNDER BANKRUPTCY CODE SECTION 523(a)(4): FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY, EMBEZZLEMENT, OR LARCENY

16

80. Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1 through 79 as if fully restated herein.

81. The Debtor acted in a fiduciary capacity while working for Trustee Sweet, and during the same time period, committed fraud and defalcation by secreting assets of the MCO bankruptcy estate that were to be acquired by UVI under the Resolution and Sale Agreement, which said assets are referred above as the UVI Assets.

82. The Debtor had a preexisting fiduciary relationship with the MCO bankruptcy estate and Trustee Sweet.

83. The Debtor was placed into a trust relationship with the MCO bankruptcy estate to protect and supervise its assets and income.

84. The trust relationship between the Debtor occurred prior to the conversion or secretion of the UVI Assets.

85. The beneficiary of the trust created between the Debtor was the MCO bankruptcy estate, including without limitations its creditors and assignees.

86. The Debtor held funds, income, the Route Locations and other assets for the benefit of third parties.

87. The trust res was the bankruptcy estate's assets and income, including the Route Locations, which, in part, were sold to UVI, but were later diverted by the Debtor for his own personal use and benefit.

88. The Debtor breached his fiduciary relationship to the MCO bankruptcy estate, its creditors and assignees.

89. RDIM acquired all cause of actions relating to MCO, its stockholders and/or ex-employees pursuant to Section 5 of the Resolution and Sale Agreement.

17

90.     Even if a fiduciary relationship cannot be proven, a debt can still be non-dischargeable under § 523(a)(4) if it is a debt for embezzlement or larceny.

91.     The income, Route Locations and other equipment owned by the MCO bankruptcy estate, including the UVI Assets, were entrusted or lawfully came into the possession of the Debtor, which were later fraudulently misappropriated by him.

92.     The Debtor actually or constructively took away property from the MCO bankruptcy estate that was, in part, sold to UVI without the knowledge or consent of Trustee Sweet with the intent to convert the property for a use other than for the benefit of the MCO bankruptcy estate.

93.     Larceny for purposes of § 523(a)(4) only requires proof that the Debtor wrongfully and with fraudulent intent took property from the MCO estate and/or UVI, the rightful owner(s).

94.     The Debtor did not own the UVI Assets.

95.     For the reasons set forth above, the Debtor committed fraud or defalcation while acting in a fiduciary capacity, embezzlement and/or larceny to UVI's detriment.

96.     The value of the UVI Assets lost by the Debtor's conduct totals at a minimum the value of the consideration paid and forgiven by RDIM, or $4 per day for each of the 164 Infringing Video Poker Games used by the MCO bankruptcy estate from the date of Debtor's bankruptcy filing to the date of entry of the final judgment against the Debtor in the instant case, plus the sum paid by UVI, or $25,000, to the MCO estate, as well as the $12,000 paid by UVI to MCO's creditor, Firestone Financial, Inc., plus the costs to fully replace the 164 video poker games converted by the Debtor, including statutory damages allowable under law, attorneys' fees and costs.

18

97.     RDIM and UVI are entitled to the debt above outlined, which should be excepted from the Debtor's bankruptcy discharge under Bankruptcy Code Section 523(a)(4) based upon the Debtor's fraud or defalcation while acting in a fiduciary capacity, embezzlement and/or larceny, and RDIM and UVI should be awarded interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b) (collectively, the "Section 523(a)(4) debt").

WHEREFORE, Plaintiffs respectfully request this Court to:

A.     Except the Section 523(a)(4) debt owed to UVI and/or RDIM from the Debtor's bankruptcy discharge pursuant to Bankruptcy Code Section 523(a)(4); and

B.     Award interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b).

## COUNT III
## EXCEPTION FROM DISCHARGE UNDER BANKRUPTCY CODE SECTION 523(a)(6): CONVERSION OF PROCEEDS

98.     Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1 through 97 as if fully restated herein.

99.     Despite the Debtor's obligations to turnover estate assets and income to the Trustee Sweet and/or the MCO bankruptcy estate, he took possession of assets and income from the MCO bankruptcy estate without any right or authorization to do so.

100.    The Debtor exercised unlawful dominion and control over assets and income that belonged to the MCO bankruptcy estate, which, in part, was sold to UVI under the Resolution and Sale Agreement (the UVI Assets).

101.    The Debtor converted and misappropriated the entire UVI Assets for their sole personal use and benefit.

19

102. Upon learning that the Debtor had misappropriated and converted UVI Assets, RDIM and UVI immediately demanded that he return the UVI Assets in accordance with the Resolution and Sale Agreement.

103. Despite RDIM's and UVI's repeated and due demand, the Debtor failed and refused to turn over the UVI Assets, but rather willfully and maliciously caused injury to RDIM and UVI by converting said UVI Assets for his sole personal use and benefit.

104. The value of the UVI Assets converted by the Debtor totals at a minimum the value of the consideration paid and forgiven by RDIM, or $4 per day for each of the 164 Infringing Video Poker Games held by the MCO bankruptcy estate from the date of the Debtor's bankruptcy filing to the date of entry of a final judgment against the Debtor in the instant case, plus the sum paid by UVI, or $25,000, to the MCO estate and $12,000 to MCO's creditor, Firestone Financial, Inc., plus the costs to fully replace the 164 video poker games converted by the Debtor, including statutory damages allowable under law, attorneys' fees and costs.

105. RDIM and UVI are entitled to the debt above outlined, which should be excepted from the Debtor's bankruptcy discharge under Bankruptcy Code Section 523(a)(6) based upon the Debtor's and Huron's acts of conversion in contravention of RDIM's and UVI's rights, yet they proceeded to deliberately and intentionally in the face of that knowledge, and thus the debt should be non-dischargeable under Section 523(a)(6) based upon the Debtor's and Huron's willful and malicious injury to RDIM's and UVI's conversion, and RDIM and UVI should be awarded interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b) (collectively, the "Section 523(a)(6) debt").

WHEREFORE, Plaintiffs respectfully request this Court to:

20

A.     Except the Section 523(a)(6) debt owed to UVI and/or RDIM from the Debtor's bankruptcy discharge pursuant to Bankruptcy Code Section 523(a)(6); and

B.     Award interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b).

## COUNT IV
## EXCEPTION FROM DISCHARGE UNDER BANKRUPTCY CODE
## SECTION 523(a)(6): CONVERSION OF PROCEEDS

106.     Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1 through 105 as if fully restated herein.

107.     Section 523(a)(6) of the Bankruptcy Code excepts debts from a debtor's discharge that are for willful and malicious injury by the debtor to another entity or to the property of another entity.

108.     The Debtor's unlicensed use of the Infringing Video Poker Games from March 2007 through the present date, all as stated above, constitutes willful and malicious infringement.

109.     Judge Zatkoff also found, as stated above, and as more fully set forth in his Opinion and Order (Dkt. 64), that the Debtor's conduct constitutes willful infringement.

110.     Such willful infringement, personally directed by the Debtor, constitutes willful and malicious injury to RDIM rights under Section 523(a)(6) of the Bankruptcy Code.

111.     By virtue of the foregoing, the Debtor's discharge of RDIM's claims in the amount of $2,002,294.16 under the default judgment in the State Court Litigation should be denied under Section 523(a)(6).

112.     By virtue of the foregoing, the Debtor's discharge of RDIM's claims in the amount of $150,000, plus attorneys' fees and costs, under the Opinion and Order (Dkt. 64) in the

Federal Court Litigation should be denied under Section 523(a)(6).

WHEREFORE, Plaintiffs respectfully request this Court to:

A.     Except the Section 523(a)(6) debt set forth in this count that is owed to UVI and/or RDIM from the Debtor's bankruptcy discharge pursuant to Bankruptcy Code Section 523(a)(6); and

B.     Award interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b).

**COUNT V**
**DENIAL OF DISCHARGE UNDER**
**BANKRUPTCY CODE SECTIONS 727(a)(2) and (a)(3)**

113.     Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1 through 112 as if fully restated herein.

114.     Prior to the Debtor's bankruptcy filing, he solely owned a Michigan limited liability company called Transaction Solutions, LLC ("Transaction Solutions").

115.     Despite the Debtor's bankruptcy filing, he has, without any right or authorization and in utter disregard for the creditors of his bankruptcy estate, surreptitiously took possession of, removed, transferred and disposed of all of the assets and income from Transaction Solutions for his sole and personal benefit.

116.     The Debtor misrepresented during his 2004 Examination that Transaction Solutions was no longer in business. To the contrary, the Debtor fraudulently transferred the assets and income from Transaction Solutions to DeMichele through FAO and, upon information and belief, to his ex-wife, Tina Drosis, through Multipoint ATM (a d/b/a previously used by Transaction Solutions and registered as such with the State of Michigan on December 31, 2006 under ID Number B2520Q), and still derives benefits from the assets previously owned and operated by Transaction Solutions.

22

117.     The Debtor, nonetheless, continues to fail to make disclosure thereof to the bankruptcy court in order to facilitate the conversion and misappropriation of such funds and make it more difficult for Plaintiffs to enforce their rights as creditors.

118.     The Debtor further misrepresented to the Chapter 7 Trustee at his 2004 Examination on July 23, 2009 that he had no income, nor any source of income, when in fact, he has been receiving compensation for services performed purportedly as an employee for FAO.

119.     DeMichele testified at his deposition on June 18, 2009 that he purchased a portion of Mirch's ATM's route, or 33 ATM machines, previously operated by Transaction Solutions for cash in an amount he is unclear of and as of this writing has failed to produce the documentation to substantial how much he paid the Debtor said ATM route.

120.     Upon a review of the bank statements from Bank of America held by FAO, which the Debtor is a signer, the 33 ATM machines generated $38,062.70 in commissions for the period March 1, 2009 through June 31, 2009, and the amount of money withdrawn from FAO's "Cash and Adjustment Account at Bank of America relative to the ATM machines for the same period totaled $402,604.50.

121.     The 33 ATM machines purportedly owned by FAO are located at the locations covering the time period set forth above.

122.     A comparison of the 33 ATM machine locations reflect that 16 of the locations are identified by the Debtor as part of his Route Locations List which he filed in the Federal Court Litigation as Dkt. 18.

123.     Upon information and belief, each ATM machine cost at least $2,000, with $2,000 in cash kept in each ATM machine. Based upon commissions totaling $38,062.70 earned for the period 3/1/09 through 6/30/09, the 33 ATM machines generated daily income averaging $316.66 per day, or $9.59 per ATM machine.

124.     Mirch further testified at his creditor's examination on August 3, 2008 that Transaction Solutions owns a credit card processing route in approximately 3-5 states outside of Michigan. The Debtor's credit card transactions at each machine is processed through First Data with their Corporate Headquarters at 6200 South Quebec Street, Greenwood Village, CO 80111.

125.     During RDIM's negotiations in 2008 with the Debtor to purchase MCO, he represented to RDIM's attorney, Robert Horvath, that he owned approximately 100 ATM machines and 350 credit card processing machines.

126.     The Debtor also made cash withdraws from FAO's Cash and Adjustment Account at Bank of America for the period February 24, 2009 through June 30, 2009 totaling $157,980. One of the withdraws made by the Debtor from the Cash and Adjustment Account at Bank of America, being Check No. 1039 dated March 20, 2009 and made payable to "Cash" in the amount of $1,500, was endorsed and deposited by the Debtor into a bank account at National City Bank, Acc. No. XXXXX6598, which said bank account has never been disclosed by the Debtor in any of his bankruptcy filings.

127.     According to the Debtor's testimony at his 2004 Examination on July 23, 2009, Transaction Solutions "...has more debt than value."

128.     According to DeMichele's testimony at his deposition on June 18, 2009, he answered the following questions relative to purchasing a portion of the Debtor's ATM route.

```
"25   Q.  Do you have ATMs in your business?
 1   A.  Yes, I do.
 2   Q.  Where did you get those from?
 3   A.  I purchased them from Jordan's ATM Company.
 4   Q.  When did you do that?
 5   A.  A couple months ago.
 6   Q.  How many months ago?
 7   A.  Probably two or three months ago.
 8   Q.  How did you pay for it?
```

24

```
 9  A.  I paid cash.
10  Q.  How much did pay him?
11  A.  I would have to look those records up to give you an
12       exact amount.
13  Q.  How much do you think you paid him?
14  A.  I don't know exactly off the top of my head.  I would
15       have to look it up.
16  Q.  Roughly?
17  A.  I'm not going to answer roughly because I don't know
18       exactly.  You know, more than $1,000, less than
19       $50,000.  I will tell you that.
20  Q.  How many ATMs did you buy?
21  A.  More than 20 and less than 40.
22  Q.  Did you know that Jordan Mirch was in bankruptcy?
23  A.  Yes.  I told you that.  You put him in bankruptcy with
24       MCOV.  I know all that.
25  Q.  Did you know that Jordan Mirch was in individual
 1       bankruptcy?
 2  A.  Oh, absolutely...."
```

129.    In further effort to frustrate, hinder, delay and obstruct Plaintiffs' rights as

creditors, the Debtor has filed false bankruptcy schedules which grossly undervalued the assets

of his estate, and failed to list assets and income.

130.    Pursuant to the Judge Shefferly's Order Granting Stipulation for Rule 2004

Examination dated July 10, 2009 (Debtor Dkt. 152), the Debtor was to produce documents, in

part, "...reflecting the ownership or disposition of any assets of Debtor...copies of tax returns for

2005 through 2008...copies of any and all leases...copies of all security agreements...all

documents reflecting account receivables...all documents reflecting Debtor's interest in any

incorporated or unincorporated business identity identified in his bankruptcy schedules..." The

Debtor has failed to produce these documents, including any documents relating to Transaction

Solutions' ATM and credit card route, wheter still operated by the Debtor, Transaction Solutions

or through another entity or proxy, such as his ex-wife, Tina Drosis or DeMichele.

131.    For the reasons set forth above and pursuant to Bankruptcy Code Sections 727

(a)(2) and (a)(3), (a)(4) and, as such, the Debtor should be denied a discharge, and Plaintiffs

should be awarded interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b).

WHEREFORE, Plaintiffs respectfully request this Court to:

A.    Deny the Debtor a bankruptcy discharge pursuant to Bankruptcy Code Sections

727 (a)(2) and (a)(3) with respect to the debt owed to each Plaintiff, as more fully identified in

Counts I through IV; and

B.    Award interest, cost of collection and attorney fees pursuant to FRBP Rule

7008(b).

**COUNT VI**
**DENIAL OF DISCHARGE UNDER**
**BANKRUPTCY CODE SECTIONS 727(a)(3), (a)(4) and (a)(7)**

132.    Plaintiffs hereby incorporate by reference the allegations set forth in Paragraphs 1

through 131 as if fully restated herein.

133.    In the Debtor's sworn bankruptcy Schedules, the Debtor lists the value of

Transaction Solutions as $0.

134.    During the 2004 Examination, the Debtor testified Transaction Solutions has no

value.

135.    Upon information and belief, the Debtor has failed to identify the true value of

Transaction Solutions, the amount of income he earns and records related to his financial

dealings with FAO and Transaction Solutions, which is purportedly now owned by DeMichele

and the Debtor's ex-wife, Tina Drosis.

136.    Pursuant to Bankruptcy Code Sections 727 (a)(3), (a)(4) and (a)(7), the Debtor's

should be denied a discharge based upon making a false oath, in that he signed her Bankruptcy

26

Schedules and Statement of Financial Affairs under oath, subject to the penalty of perjury, and said Schedules and Statement of Financial Affairs contain inaccurate statements as to (1) the Debtor's current income; (2) the value of Debtor's interest in Transaction Solution; and (3) the value and the Debtor's respective ownership interest in the ATM and credit card routes. Plaintiffs should further be awarded interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b).

WHEREFORE, Plaintiffs respectfully request this Court to:

A.    Deny the Debtor a bankruptcy discharge pursuant to Bankruptcy Code Sections 727(a)(3), (a)(4) and (a)(7) with respect to the debt owed to each Plaintiff, as more fully identified in Counts I through IV; and

B.    Award interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b).

Respectfully Submitted,

RICHARD B. POLING JR.  P25312
Attorney for Adversarial Plaintiffs
5455 Corporate Drive, Suite 104
Troy, MI 48098
January 8, 2010                (248) 641-0500

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In Re:
**JORDAN MIRCH,**

        Debtor.

_____/

**RDI OF MICHIGAN, LLC,**
        Plaintiff,

-vs-

**JORDAN MIRCH,**

        Defendant.

_____/

CASE NO. 08-64473
CHAPTER 7
HON. PHILLIP J. SHEFFERLY

Adv. Proc. No. 09-04060

## PROOF OF SERVICE

STATE OF MICHIGAN )
COUNTY OF OAKLAND )

      LAURA PETRUCCI, being first duly sworn, deposes and says that on January 8, 2010, she did serve a true and correct copy of Plaintiffs' First Amended Complaint To Except Debts From Discharge Pursuant to Bankruptcy Code Section 523 and To Deny Debtor Discharge Under Bankruptcy Code Section 727, with this Proof of Service upon: John D. Hertzberg, 30150 Telegraph Road, Suite 444, Bingham Farms, MI 48025 by depositing same in a government mail receptacle at the Troy Post Office, enclosed in a sealed envelope, plainly addressed as indicated above, with postage thereon fully prepaid.

                                    _____
                                    LAURA PETRUCCI

Subscribed and sworn to before me
this 8th day of January, 2010.

_____
LINDA K. WHITACRE, Notary Public
Oakland County, Michigan
My Commission Expires: 07/24/2011
Acting in Oakland   County